IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES WOOD,                                           3:11-CV-1126-PK

                                                      OPINION AND
                                                      ORDER

                        Plaintiff,

v.

THE ARCHDIOCESE OF PORTLAND
IN OREGON, and THE ROMAN CATHOLIC
ARCHBISHOP OF PORTLAND IN
OREGON,

                        Defendants.

_____

PAPAK, Magistrate Judge:

        Plaintiff James Wood filed this action against defendants The Archdiocese of Portland in

Oregon (the "Archdiocese") and The Roman Catholic Archbishop of Portland in Oregon (the

"Archbishop") on September 19, 2011.  Wood filed an amended complaint December 14, 2011.

By and through his amended complaint, Wood alleges the defendants' vicarious liability for

Page 1 - OPINION AND ORDER

sexual battery of a child on a theory of *respondeat superior*, and prays for "economic damages and noneconomic damages in excess of $3,000,000," as well as "punitive damages. . . in an amount to be proven at trial." This court has jurisdiction over Wood's action pursuant to 28 U.S.C. § 1334(b), based on the relatedness of these proceedings to a case arising under Title 11 of the United States Code.[1]

Now before the court is defendants' Federal Civil Procedure Rule 12(b)(6) motion (#20) to dismiss Wood's prayer for punitive damages for failure to state a claim on which relief can be granted. I have considered the motion and all of the pleadings and papers on file. For the following reasons, defendants' motion is granted.

## LEGAL STANDARD

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id., quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the

---

[1] Specifically, this action is subject to the future claims fund under the Third Amended and Restated Joint Plan of Reorganization confirmed in *In re Roman Catholic Archbishop of Portland*, 04-37154, which, in relevant part, sets a $20 million cap on the total funds available to pay all claims made against the Archdiocese through 2023.

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "In sum, for a complaint to

survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from

that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v.*

*United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained

in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial

notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to

dismiss, this court accepts all of the allegations in the complaint as true and construes them in the

light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007).

Moreover, the court "presume[s] that general allegations embrace those specific facts that are

necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994),

*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however,

accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v.*

*Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## WOOD'S ALLEGATIONS

By and through his amended complaint, Wood alleges, in relevant part, as follows.[2]

Wood was born in November 1976. *See* Amended Complaint at ¶ 4. In 1986, when Wood was

approximately ten years old, he became a member of St. Paul's Parish in Silverton, Oregon. *See*

*id.* at ¶¶ 3, 4. St. Paul's was owned, controlled and operated by the defendants in this action. *See*

---

[2] The following recital constitutes my construal of Wood's allegations for sole purposes
of the motion now before the court. I make no findings of fact herein.

*id.* at ¶ 3.  Wood remained a member of St. Paul's from 1986 through 1993.  *See id.* at ¶ 4.

During the time when Wood was a member of St. Paul's, a priest who shall herein be
referred to as Father "D." was an employee and agent of the defendants assigned to serve at St.
Paul's.  *See id.* at ¶ 5.  "[Fr. D.]'s performance of his ordinary and authorized pastoral duties
included cultivating a trust relationship with plaintiff, and included discussing sexuality with
plaintiff."  *Id.*, ¶ 10.

> In order to carry out his employment and administrative duties at St. Paul's Parish,
> [Fr. D.] acted as youth pastor, priest, youth group organizer, confessor, role
> model, and friend to the plaintiff.  By virtue of his status and job duties as an
> employee and agent of defendant, [Fr. D.] gained the support and permission of
> the plaintiff's parents to spend time with the plaintiff and to spend time alone with
> the plaintiff, developing and maintaining a social relationship.  [Fr. D.] won the
> respect, loyalty, and obedience of the plaintiff while simultaneously acting in the
> interest of his employer and employment.  [Fr. D.] used his position to have other
> boys under his pastoral guidance accompany him and plaintiff on outings. [Fr. D.]
> used other boys under his pastoral counseling, and his position of trust to
> ingratiate himself with plaintiff and **the sexual abuse described [in Wood's
> complaint] resulted from acts within [Fr. D]'s scope of employment by
> defendants.**  [Fr. D.]'s pastoral duties included discussing sexual development
> with youth, including the plaintiff.  [Fr. D.] gained a position of trust with plaintiff
> as a direct result of his pastoral duties.

*Id.* (emphasis supplied.)  Fr. D. sexually abused Wood during the period from 1986 through
1993, during which time Wood was in his minority, causing Wood to suffer emotional trauma
and other socio-emotional distress and impairment.  *See id.* at ¶¶ 6-8.  In addition, the sexual
abuse Wood suffered at Fr. D.'s hands caused him to suppress his memory of the abuse until
approximately spring 2010.  *See id.* at ¶ 9.

## ANALYSIS

Defendants move to dismiss Wood's prayer for punitive damages only.  The Oregon
Supreme Court has affirmed that where a principal is vicariously liable for the acts of its agent,

punitive damages are available as against the principal based solely on the agent's actions, so long as punitive damages would be available against the agent and the agent's conduct giving rise to exposure to punitive damages occurred within the scope of the agent's agency:

> A majority of courts have adopted the rule that, if the servant has committed a tort within the scope of his employment so as to render the corporation liable for compensatory damages, and if the servant's act is such as to render him liable for punitive damages, then the corporation is likewise liable for punitive damages.
> * * *
>
> * * *
>
> Under this test, when an employee commits a wrongful act which would subject him personally to punitive damages, **the essential inquiry must be whether the act was committed while the employee was acting within the scope of his employment**, that is:
>
> > whether the servant at the time of the commission of the injury was performing a service for the master in furtherance of the master's business, not whether it was done in exact observance of detail prescribed by his employer.  * * *
>
> If the employee was acting within the scope of his employment, the corporation will be liable for punitive damages . . . .
>
> We feel that this rule represents the better view with regard to the liability of a corporation for punitive damages, and is the only rule compatible with this court's prior statements that punitive damages are justified as a deterrent to prevent the violation of societal interests.

*Stroud v. Denny's Restaurant, Inc.*, 271 Or. 430, 435-437 (1975) (citations, internal quotation marks omitted; emphasis supplied); *see also Johannesen v. Salem Hosp.*, 336 Or. 211, 219 (2003) (expressly rejecting the theory that a vicarious-liability defendant "cannot be held vicariously liable for punitive damages without evidence of fault on its part" and finding "no reason to revisit" the *Stroud* court's holding).  Here, it is Wood's position that, while Fr. D.'s acts of child sexual abuse were concededly not undertaken within the scope of his employment, his

acts of abuse nevertheless "resulted from" actions that *were* undertaken for the purpose of

carrying out Fr. D.'s employment duties, apparently including his actions "as youth pastor, priest,

youth group organizer, confessor, role model, and friend to the plaintiff." Wood does not specify

in what manner these employment-related actions "resulted in" Fr. D.'s subsequent acts of abuse.

The analysis Wood advocates for imputing liability for punitive damages from servant to

master on the basis of the servant's conduct outside the bounds of employment has been imported

from Oregon's *respondeat superior* jurisprudence. According to the Oregon Supreme Court:

> Under the doctrine of *respondeat superior*, an employer is liable for an employee's
> torts when the employee acts within the scope of employment. Negligence or
> other tortious conduct by the employer is not required. . . .
>
> Three requirements must be met to conclude that an employee was acting within
> the scope of employment. These requirements traditionally have been stated as:
> (1) whether the act occurred substantially within the time and space limits
> authorized by the employment; (2) whether the employee was motivated, at least
> partially, by a purpose to serve the employer; and (3) whether the act is of a kind
> which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).

The *Chesterman* court specified, however, that where there is a "'time-lag' between the act

allegedly producing the harm and the resulting harm," it is inappropriate to analyze the

applicability of the *respondeat superior* doctrine "as of the time that the injury occurred." *Id.* at

444. Under that circumstance, the court ruled, "[t]he focus should be on the *act* on which

vicarious liability is based and not on when the act results in *injury*." *Id.* (emphasis original).

Applying that principle, the court found that an employer could be vicariously liable for its

employee's acts where the employee ingested a hallucinogenic drug allegedly for the purpose of

maintaining focus at work and then later, outside the workplace and outside the scope of his

employment – but still under the influence of the drug and, allegedly, in consequence of the

drug's effects – entered a woman's home and sexually assaulted her. *See id.* at 443-444.

    Eleven years later, in a case (like the one now before the court) involving sexual assault

allegedly committed by an employee of the Archdiocese, the Oregon Supreme Court had

occasion to clarify the *Chesterman* ruling. Noting that "an employee's intentional tort rarely, if

ever, will have been authorized expressly by the employer," the court in *Fearing v. Bucher*, 328

Or. 367 (1999), acknowledged that the employee's "sexual assaults . . . clearly were outside the

scope of his employment," but held that "the [vicarious liability] inquiry does not end there."

*Fearing v. Bucher*, 328 Or. 367, 374, 374 n. 4 (1999).  Instead, the court held, "[t]he Archdiocese

still could be found vicariously liable, if acts that were within [the employee]'s scope of

employment *resulted in* the acts which led to injury to plaintiff."  *Id.* (citation, internal quotation

marks omitted; emphasis supplied).  That is, "where . . . the employer's vicarious liability arises

out of the employee's commission of an intentional tort, [the court] must consider whether . . .

allegations contained in the . . . complaint state ultimate facts sufficient to establish that acts that

were within [the employee]'s scope of employment resulted in the acts that caused injury to

plaintiff."  *Id.*

    The *Fearing* court recited the material allegations of the plaintiff's complaint as follows:

> The complaint alleges that [the employee priest] used his position as youth pastor,
> spiritual guide, confessor, and priest to plaintiff and his family to gain their trust
> and confidence, and thereby to gain the permission of plaintiff's family to spend
> large periods of time alone with plaintiff. By virtue of that relationship, [the
> employee] gained the opportunity to be alone with plaintiff, to touch him
> physically, and then to assault him sexually.  The complaint further alleges that
> those activities were committed in connection with [the employee]'s employment
> as youth pastor and priest, that they were committed within the time and space
> limitations of [the employee]'s employment, that they were committed out of a

> desire, at least partially and initially, to fulfill [the employee]'s employment duties
> as youth pastor and priest, and that they generally were of a kind and nature that
> was required to perform as youth pastor and priest.

*Id.* Based on these allegations, the *Fearing* court reasoned that "a jury could infer that the sexual

assaults were the culmination of a progressive series of actions that began with and continued to

involve [the employee]'s performance of [his] ordinary and authorized duties." *Id.* at 375.

> Viewing the complaint in that light, the jury also could infer that, in cultivating a
> relationship with plaintiff and his family, [the employee], at least initially, was
> motivated by a desire to fulfill his . . . duties and that, over time, his motives
> became mixed.  We conclude that the . . . complaint contains allegations sufficient
> to satisfy all three *Chesterman* requirements for establishing that employee
> conduct was within the scope of employment.

*Id.* The *Fearing* court expressly rejected the Archdiocese's argument that the allegations of the

complaint amounted only to legal conclusions or mere restatements of the *Chesterman* factors

themselves. *Id.* at 375 n. 5.  The court reasoned that:

> An ultimate fact is a fact from which legal conclusions are drawn.  A conclusion
> of law, by contrast, is merely a judgment about a particular set of circumstances
> and assumes facts that may or may not have been pleaded. . . .  Allegations of
> when particular conduct occurred, of the motivation behind that conduct, and of
> the employment-related nature of that conduct all are assertions of fact, which can
> be proved or disproved.

*Id.* (citations omitted).

The *Fearing* court further expressly rejected the argument that, because the alleged sexual

abuse could not reasonably have furthered any interest of the employer, it could not have been

within the scope of the employee's duties, reasoning that:

> in the intentional tort context, it usually is inappropriate for the court to base its
> decision regarding the adequacy of the complaint on whether the complaint
> contains allegations that the intentional tort *itself* was committed in furtherance of
> any interest of the employer or was of the same kind of activities that the
> employee was hired to perform.  Such circumstances rarely will occur and are not,

in any event, necessary to vicarious liability. Rather, the focus properly is directed
at whether the complaint contains sufficient allegations of [the employee]'s
conduct that was within the scope of his employment that arguably resulted in the
acts that caused plaintiff's injury.

*Id.* at 375-376 (emphasis original).

The *Fearing* court specifically distinguished the facts before it from those where the

circumstances of employment merely created an *opportunity* for an intentional tort to be

committed, indicating that mere opportunity was not sufficient to support a finding of vicarious

liability:

Here, plaintiff alleges that [the employee] "used and manipulated his fiduciary
position, respect and authority as youth pastor and priest" to befriend plaintiff and
his family, gain their trust, spend large periods of time alone with plaintiff,
physically touch plaintiff and, ultimately, to gain the opportunity to commit the
sexual assaults upon him. A jury reasonably could infer that [the employee]'s
performance of his pastoral duties with respect to plaintiff and his family were a
necessary precursor to the sexual abuse and that the assaults thus were a direct
outgrowth of and were engendered by conduct that was within the scope of [the
employee]'s employment.

*Id.* at 377 (citation omitted).

Finally, the *Fearing* court also affirmed the well-established proposition that "[w]hether

an employee has acted within the scope of employment at any given time generally is a question

for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the

facts pled." *Id.* at 374.

Shortly after the *Fearing* opinion issued, in *Lourim v. Swensen*, 328 Or. 380 (1999), a

case involving sexual assault upon a minor Boy Scout by a Boy Scout troop leader, the Oregon

Supreme Court relied upon the same reasoning employed in *Fearing* to conclude that an

extended course of employment-related cultivation of the trust of a minor and his family could

Page 9 - OPINION AND ORDER

give rise to vicarious employer liability. The *Lourim* court recited the material facts of the

plaintiff's complaint as follows:

> From 1965 to 1967, [the employee defendant] was a volunteer Boy Scout leader,
> duly authorized by the Boy Scouts to act as such. As part of his volunteer duties
> with the Boy Scouts, he was directed to fulfill the role of troop leader or assistant
> troop leader to plaintiff's troop. Plaintiff and his family became close to [the
> employee defendant], and [the employee defendant] was a frequent guest in their
> home. [The employee defendant] gained the trust and confidence of plaintiff's
> family as a suitable friend, guide, mentor, and role model to plaintiff, then an
> adolescent. By virtue of that relationship, [the employee defendant] gained the
> support, acquiescence, and permission of plaintiff's family to spend substantial
> periods of time alone with plaintiff.
>
> [The employee defendant] also won the friendship and admiration of plaintiff
> himself. He was his mentor and role model. [The employee defendant] gained
> the opportunity to socialize with plaintiff and to spend time alone with him and
> together with other boys in remote places. [The employee defendant] also used
> his position of trust to gain the opportunity to touch plaintiff physically.
> Eventually, [the employee defendant] committed a series of sexual assaults on
> plaintiff. At the time of those assaults, plaintiff was a minor.
>
> The complaint describes [the employee defendant]'s performance of his duties as
> troop leader in developing a trust relationship with plaintiff and his family,
> together with the eventual sexual assaults, as "manipulations." Plaintiff alleges in
> the complaint that the manipulations were committed in connection with [the
> employee defendant]'s performance of his duties as troop leader:
>
> > "The manipulations * * * were committed within the time and space limits
> > of his responsibilities as troop leader, were committed out of a desire, at
> > least initially and partially, to fulfill his duties as troop leader, and were
> > generally actions of a kind and nature which [the employee defendant] was
> > required to perform as troop leader."

*Lourim*, 328 Or. at 384-385. Accepting these allegations as true, and applying the principles

articulated in *Fearing*, the court concluded that "a jury reasonably could infer that the sexual

assaults were merely the culmination of a progressive series of actions that involved the ordinary

and authorized duties of a Boy Scout leader." *Id.* at 396. The court further concluded that:

Page 10 - OPINION AND ORDER

a jury could infer that, in cultivating a relationship with plaintiff and his family, [the employee defendant], at least initially, was motivated by a desire to fulfill his duties as troop leader and that, over time, his motives became mixed. A jury also reasonably could infer that [the employee defendant]'s performance of his duties as troop leader with respect to plaintiff and his family was a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee defendant]'s employment. Finally, a jury could infer that [the employee defendant]'s contact with plaintiff was the direct result of the relationship sponsored and encouraged by the Boy Scouts, which invested [the employee defendant] with authority to decide how to supervise minor boys under his care. Based on the foregoing, we conclude, as we did in *Fearing*, that the amended complaint contains allegations sufficient to satisfy all three *Chesterman* requirements.

*Id.* at 386-387.

Wood's argument that intentional acts undertaken by a servant outside the scope of the servant's employment duties may be imputed to the servant's master for purposes of liability for punitive damages where the intentional acts result in some sense from the servant's previous conduct within the scope of the servant's employment duties is, in effect, an argument that, under Oregon law, vicarious liability for punitive damages is treated in precisely the same manner as vicarious liability for actual damages. As no Oregon court has directly addressed this question, defendants' motion necessarily raises an issue of first impression in Oregon. Nevertheless, I am persuaded that the Oregon Supreme Court would squarely reject Wood's position.

I note, first, that in the nearly quarter-century since *Chesterman* issued, no Oregon court has ever suggested that a master could be vicariously liable for punitive damages on the basis of intentional conduct by the master's servant of a kind the servant was not hired or instructed to perform. I further note in this connection that the analysis first articulated in *Chesterman* and later developed in the *Fearing/Lourim* line of cases has frequently expressly been applied to intentional torts of a kind that would clearly support imposition of punitive damages against the

Page 11 - OPINION AND ORDER

tortfeasor, as, for example, the rape of children by ordained priests, suggesting that the Oregon courts likely would not countenance imposition of vicarious punitive damages on a *respondeat superior* theory under such circumstances.

Second, I cannot conceive of any way in which the purpose that generally underlies imposition of punitive damages – deterrence of future egregious misconduct – would be furthered by imposition of punitive damages against employers on the basis of employee misconduct outside the scope of employment. Wood has not pled that defendants knew or should have known that Fr. D. was likely to sexually abuse the children whose care defendants charged him with, or that defendants breached any standard of care that they owed to Wood in supervising or training Fr. D. I am at a loss to see in what way future sexual abuse of children by employees could be deterred by imposition of punitive damages against an employer that lacked any grounds for suspecting that one of its employees represented a risk to children.

In the absence of any suggestion from any Oregon court that the Oregon Supreme Court would extend Oregon's extraordinary jurisprudence governing *respondeat superior* liability for actual damages to the punitive damages context, and in the absence of any coherent policy rationale for such extension, I conclude that the Oregon courts would not impute liability for punitive damages to a master on the basis of a servant's intentional acts undertaken outside the scope of the servant's employment by the master, even where the intentional acts were a consequence of prior actions undertaken within the scope of the servant's employment. In consequence, defendants' motion is granted, and Wood's claim for punitive damages is dismissed.

Page 12 - OPINION AND ORDER

## CONCLUSION

For the reasons set forth above, defendants' motion (#20) to dismiss is granted, and

Wood's punitive damages claim is dismissed.


Dated this 20th day of March, 2012.

Honorable Paul Papak
United States Magistrate Judge